Filed 10/10/14  P. v. Reyes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARIO ADRIAN REYES,<br><br>    Defendant and Appellant. | G049922<br><br>(Super. Ct. No. FWV802766)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Stephan G. Saleson and Shahla Sabet, Judges.  Affirmed.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Mario Adrian Reyes was sentenced to 27 years to life in prison for murdering his former girlfriend in the first degree. Although a jury found appellant was competent to stand trial, he contends that finding was tainted by irrelevant and prejudicial evidence. He also contends the trial court should have declared a doubt about his competency in light of events that transpired after the jury's initial finding. As for the guilt phase of his trial, appellant claims the trial court erred by failing to instruct the jury on heat of passion manslaughter and by failing to define second degree murder. None of appellant's claims have merit. We therefore affirm the judgment against him.

FACTS

In 2008, Ana Garcia was living with Jose Cedano at her parents' house in Ontario. However, after Garcia met appellant in the summer of that year, she broke off her relationship with Cedano, and appellant moved in with her and her family. Appellant was very controlling and jealous of Garcia. In September 2008, he told a coworker he wanted to marry Garcia and would kill her if she ever tried to leave him. But Garcia was not in love with appellant. In fact, not long after they began living together, she told him she wanted to break up and get back together with Cedano. Upon hearing this, appellant said he was going to send someone to kill Cedano.

On October 7, 2008, Garcia was at her parents' house packing up her belongings. She had borrowed her brother-in-law's pickup truck and was planning on moving in with her sister. But while she was packing, appellant entered the house and fatally struck her in the head with a heavy iron object. He then wrapped her body in blankets, put it in the bed of the pickup truck and drove off in the truck.

After stopping at a gas station to fuel up and withdraw money from Garcia's bank account, appellant rented a storage unit in Inglewood and stashed Garcia's body inside the unit. Then he withdrew cash from his own bank account and bought two dozen roses at a nearby grocery store. Returning to the storage unit, he spread the roses over Garcia's body and he headed for Mexico. After abandoning the pickup truck in San

2

Ysidro and trying to withdraw more money there, appellant crossed the border and made his way to San Felipe.

About a month later, he was captured by Mexican authorities and returned to the United States. In a tear-filled interview with police investigators, appellant confessed to the killing. He said that on the day of the incident, he helped Garcia move some of her belongings into a storage unit. But when they returned to her parents' house, she did not want his help anymore and told him to leave. Fearful of losing Garcia, he followed her inside the house and hit her with an object he got from the kitchen. While admitting there was lots of blood involved, appellant did not provide a lot of details about the slaying. He simply said he wanted Garcia to be with his deceased mother, away from all of her troubles in this world.

Appellant was charged with first degree premeditated murder. Although he did not present any evidence in his defense, his attorney argued appellant was only guilty of second degree murder because he was provoked by the thought of losing Garcia. The jury convicted appellant as charged, and he was sentenced to 27-years-to-life in prison, representing 25 years for the murder, a year for using a deadly weapon, and a year for having served a prior prison term.

*The Pretrial Competency Hearing*

Appellant contends the trial court abused its discretion and violated his due process rights by admitting evidence regarding the underlying murder at his competency hearing. We disagree.

On February 4, 2009, about four months into the case, defense counsel declared a doubt about appellant's competency. The court thereupon suspended criminal proceedings and appointed two mental health professionals to evaluate appellant and report on his competency to stand trial. (Pen. Code, §§ 1367, 1368.)

Psychologist Maurizio Assandri, Ph.D., reported that he attempted to interview appellant in jail on February 21, 2009. However, appellant refused to talk to

3

him, so he formulated his opinion about appellant's competency based on the police and jail records he was provided. Those records revealed that while appellant was rational and expressive when he was arrested, he was depressed and suicidal when he was taken to jail, where he was diagnosed with psychotic disorder, amphetamine dependence and personality disorder. After a brief stint on suicide watch, appellant was placed in the "unusual behavior" unit and prescribed various medications.

Appellant's records further revealed that although he refused to talk to jail staff and medical personnel, he conversed freely and coherently with other inmates. On several occasions, he expressed frustration to his peers about being incarcerated and asked them what he needed to do to get into Patton State Mental Hospital. Appellant also made a mask out of a Styrofoam tray and drew a satanic picture on the wall of his cell, although he was generally well behaved. Based on all the information he reviewed, Dr. Assandri was convinced appellant was competent to stand trial. He felt appellant was feigning mental illness to avoid prosecution for his crime.

The second psychologist to see appellant was Dr. Fazlollah Aldavoud. When he went to appellant's cell to interview him, appellant curled up in bed and pulled a blanket over his head. Due to appellant's lack of cooperation, Dr. Aldavoud could not determine if he was competent. However, based on appellant's postarrest statements and his behavior in jail, Dr. Aldavoud believed appellant was, at the very least, "coherent."

Given Dr. Aldavoud's inability to render an opinion on appellant's competency, the court appointed a third psychologist, Dr. Laura Brodie, to evaluate him. She fared no better in terms of getting appellant to cooperate for an interview. Nevertheless, in reviewing appellant's records, she did not detect any signs he was suffering from a serious mental illness. Nor did it appear appellant's medication was having any effect on his behavior. Suspecting appellant was trying to manipulate the court system, Dr. Brodie reported he was being "selectively mute" by talking to inmates

4

but not staff. While she could not offer a definitive opinion about appellant's competency, she felt there was "indirect evidence" he was competent to stand trial.

Because none of the doctors were able to interview appellant, the court scheduled a jury trial to decide the issue of appellants' competency. In the hearings leading up to that trial, appellant expressed displeasure with his court-appointed attorney and acted unruly on several occasions. He also brought a *Faretta* motion to represent himself (*Faretta v. California* (1975) 422 U.S. 806), but the court denied that request pending resolution of the competency issue.

On October 9, 2009, about two months before the competency trial, the court did allow appellant to bring a *Marsden* motion for a new attorney. (*People v. Marsden* (1970) 2 Cal.3d 118.) At the hearing, appellant complained his attorney did not care about his case. He also baldly alleged that his life was in danger and that he needed to be placed in protective custody. After defense counsel recounted his considerable experience as a defense attorney and his various interactions with appellant, the court denied appellant's *Marsden* motion.

Attention then shifted to the competency trial. On the eve of trial, the prosecution moved to admit evidence surrounding the underlying crime. The prosecution argued appellant's postcrime activities and statements were relevant because they evinced rational thinking, planning and goal-directed behavior. The prosecution also argued appellant's actions before and around the time of crime were relevant to give the jury a "baseline" of how he acted at that time, so the jury could compare that to how he was behaving in custody and determine whether he was feigning incompetency. Defense counsel objected to the evidence as irrelevant and unduly prejudicial, but the court overruled the objection. Given appellant's refusal to be interviewed by any of the court-appointed psychologists, the court determined the prosecution could present evidence of appellant's actions and statements before and after the murder. However, cognizant of

5

the potential prejudice of such evidence, the court warned the prosecutor that "we're not going to try a murder case within the context of a competency hearing."

The competency trial commenced on December 2, 2009. At the outset, the court instructed jurors they should not consider the fact criminal proceedings against appellant had been suspended in deciding whether he was competent to stand trial, i.e., whether he could 1) understand the nature of the criminal proceedings against him; 2) rationally assist his attorney in presenting his defense; and 3) understand his status and condition in the criminal proceedings. The jury was also instructed not to consider appellant's guilt or innocence on the underlying crime or whether he was sane at the time it was committed. And they were told not to let bias, prejudice or possible punishment influence their decision.

At trial, Garcia's mother and sister testified that, in their interactions with appellant in the two months before the murder, he did not say anything odd or exhibit any strange behavior. However, by the time of the murder, Garcia had broken up with appellant and was planning on moving on without him. Garcia's mother further testified that when she saw the murder scene a few hours after Garcia was killed, there was a trail of blood leading from the living room into the bedroom, where appellant apparently wrapped Garcia in blankets.

The prosecution also presented evidence that while appellant was driving around with Garcia's body following the murder, he stopped for gas and flowers, made several cash withdrawals and rented a storage unit. And when the police discovered his pickup truck at the border, they found blood in the back bed. In addition, evidence was presented that after appellant was captured, he told investigators about the storage unit, which led to the discovery of Garcia's body under a pile of blankets and roses.

With regard to appellant's behavior in custody, jail personnel testified he was placed in the general population in June 2009, about six months after his arrival. When appellant first came to the jail, he kept himself and his cell very clean, which was

6

contrary to what most mentally impaired inmates did. However, as time went on, he refused to shower and would sometimes smear feces on the wall of his cell. But rather than smearing it haphazardly and refusing to clean it up, as the seriously disturbed inmates did, he made uniform little crosses with his feces and cleaned it up himself. And although he refused to talk to jail personnel, he often conversed with other inmates.

Dr. Assandri testified a person can suffer from mental illness and still be competent to stand trial, and incompetency is not something that develops overnight. So the fact appellant behaved normally in the months leading up to the murder and exhibited rational behavior after the murder (in trying to avoid apprehension and in speaking with the police and others) led Dr. Assandri to believe appellant was competent to stand trial. And while Dr. Aldavoud was unwilling to offer a definitive opinion about appellant's competency without interviewing him, he said his diagnosis was leaning more toward competency than incompetency. Drs. Assandri and Aldavoud both believed appellant was malingering in order to avoid the consequences of his behavior. The jury found appellant was competent to stand trial.

In challenging that verdict, appellant asserts the evidence should have been limited to his conduct in jail and should not have included anything about the underlying murder or his conduct immediately thereafter. More particularly, appellant contends the evidence showing he withdrew money from Garcia's bank account after killing her was irrelevant because the withdrawals occurred more than a year before his competency trial. In his view, the evidence was not probative of his mental state at the time of the trial and only showed his callousness, much like the evidence regarding the discovery of Garcia's body in the storage unit, surrounded by roses. Even more inflammatory, in appellant's opinion, was the evidence showing that blood was found at the murder scene and in the back of the pickup truck he used to transport Garcia's body.

"'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the

7

relative probativeness and prejudice of the evidence in question [citations].  Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].  [Citation.]'  'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.'  [Citation.]"  (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

These standards pose a difficult challenge for appellant.  Indeed, in reviewing the fairness of competency proceedings, the California Supreme Court has repeatedly upheld the admissibility of evidence about the defendants' underlying crimes that was far more vivid and potentially prejudicial than the evidence adduced at appellant's competency trial.  For example, in *People v. Dunkle* (2005) 36 Cal.4th 861, the court determined it was proper for the prosecution to elicit detailed testimony about how the defendant stabbed and strangled two people to death and tried to kill another person by running him over in his car.  (*Id*. at p. 884.)  The court found the evidence "served a legitimate purpose in the competency trial: to convey to the jurors the essence of the case against which defendant would have to defend himself, in order that they could assess his understanding of the charges and ability to assist counsel in his defense." (*Ibid*.)

And in *Jablonski, supra,* the court ruled it was permissible for the prosecution to play a tape recording in which the defendant, "in graphic and brutal detail," described a string of murders he had committed.  (*People v. Jablonski, supra*, 37 Cal.4th at p. 805.)  Even though the recording was made two years before the defendant's competency trial, the court determined it was relevant to show he had a rational capacity to recall and communicate and was thus feigning his mental illness to avoid punishment for his crimes.  (*Id*. at pp. 805-806.)

In rejecting the evidentiary and due process claims presented in *Dunkle* and *Jablonski*, the Supreme Court also found it significant the jurors in those cases had been

instructed not to consider whether the defendant was guilty of the underlying crimes and not to be swayed by bias, prejudice or the consequences of their verdict. (*People v. Dunkle, supra,* 36 Cal.4th at pp. 884-885; *People v. Jablonski, supra,* 37 Cal.4th at p. 806.)

Here, the jury was instructed in similar fashion. Yet, compared to the evidence presented in *Dunkle* and *Jablonski,* the evidence introduced at appellant's competency trial was relatively tame. Moreover, the challenged evidence concerning appellant's behavior before and after the killing – which depicted him as a fairly normal and rational person who was fully capable of verbal expression – was highly relevant to the central issue in the competency trial. Namely, whether appellant was feigning mental illness to avoid the consequences of his behavior or whether he was actually incapable of understanding the court proceedings and assisting counsel in preparing a defense. Because the challenged evidence was highly probative and minimally prejudicial, the trial court did not abuse its discretion or violate appellant's due process rights by admitting it at his competency trial.

*Subsequent Pretrial Events*

Even though a jury found he was competent to stand trial, appellant asserts the trial court erred in failing to declare a doubt about his competency in light of events that transpired after his initial competency trial. We perceive no error in this regard.

While the jury found appellant competent to stand trial on December 9, 2009, and the court reinstated criminal proceedings at that time, the guilt phase of appellant's trial did not commence until October 2012. Over the course of that period, appellant appeared in court on roughly 40 occasions. He often requested a new attorney or asked to represent himself. In fact, between January 2010 and January 2012, appellant made four *Marsden* motions and multiple *Faretta* motions. (Appellant felt his attorney wasn't working hard enough for him, and he could do a better job representing himself.) Although the court denied all of the *Marsden* motions, it did allow appellant to represent

9

himself for the better part of the pretrial proceedings. During that time, appellant went through three investigators and registered countless complaints about the conditions of his confinement. Among other things, he alleged he was being denied access to the jail law library and proper medical treatment and his jailors were unlawfully searching his cell and stealing his legal papers.

On January 6, 2012, appellant reiterated his complaints in that regard and told the court he suspected the jail staff was working for the prosecution. He also said, "I've been having problems seeing a psychiatrist. They come every six months. That's not enough for me, sir." When the judge told appellant he would renew his request for him to receive proper treatment, appellant said, "I'm asking you because I need help from a psychiatrist and they're not showing up. I put request after request." At that point in the case, and for the next several months, appellant was acting as his own attorney.

On March 16, 2012, appellant again complained to the court about lack of medical attention. He said, "I need to see the psych because I seen Christina, the psych tech. She told me I had a new doctor. And this is the third week and I went on suicide watch. They gave me another doctor. They don't want to give me my meds. I need a court order to see a doctor . . . because there's no doctor seeing me and I need my medication." The court told appellant it would make an ongoing request for him to receive all the medical and psychiatric attention he needs.

At the next hearing, the court indicated there had been a problem in appellant's holding cell when he appeared for his last court hearing. Appellant denied that and announced he was now ready for trial. In a rambling soliloquy, he told the court: "Even though you violated my rights and so forth and whatever happened. Those third parties that's nothing. That's not even – don't waste our time. That was part of a plan, set up. Mr. Murphy downstairs, Tommy Murphy, you know Mr. Murphy don't you? He was a witness for Mr. Bauer, he's downstairs I'm glad he's here, maybe we can bring him up and stand over there. Most of this paperwork I think he drafted up, this writing,

10

motions and all.  All that is a lie, let's put it like that.  Forget about the departments, forget about the probation.  I want to go to trial asap."

While appellant was speaking, it became clear that he was holding something in his hand.  He said it was an exhibit for his trial and he wanted to give it to the prosecutor.  After the hearing was over and appellant left the courtroom, the court remarked appellant "was extremely aggressive and disruptive this morning with his pronouncements.  He also had something in his hand which apparently has now been retrieved.  It appears to be some sort of a plastic object, about an inch by maybe two inches.  It has no writing.  It has no apparent value, meaning or anything whatsoever, but it appears to be something that in the court's opinion could be used as a weapon.  [¶] [Appellant] didn't want to open his hand to give it to the deputy, it was taken from him and we'll deal with that situation on July 20th," which was the date set for trial.

A week before that, on July 13, 2012, appellant appeared in court and requested a continuance because he'd recently had a "slip and fall" at the jail.  After granting the request, the court asked appellant about the plastic object.  He said it was not a weapon and its relevance would become clear at trial.  He also said that, because of the conditions of his confinement, which allegedly included death threats from the guards, he had submitted a grievance to the San Bernardino Board of Supervisors.  Appellant complained about his poor eyesight and hearing, as well, saying the Mexican authorities took his hearing aid after taking him into custody.

On July 27, 2012, the court noticed appellant was slumped over in his chair with his head down.  When the court asked him how he was doing, he said his jailers had given him the wrong medication and were trying to kill him.  He accused them of neglecting his medical and psychological needs and claimed, "They keep abusing me, twisting my fingers."  Appellant also alleged the guards kept taking his paperwork and wouldn't let him go to the library.  He said, "I'm in the hole because I want to be there, try to be in a quiet place, they still won't leave me alone.  They want a cell search, take

11

personal paperwork. Then he said he needed to get out of jail "before somebody gets really hurt."

Throwing himself on the mercy of the court, appellant told the judge, "Whatever you think [I am] guilty of, please give it to me today. It's going to get worse at West Valley jail, either I'm going to catch a case where [an] officer assaults me or I'm going to use self-defense or something is going to happen . . . so please get me out of that jail. I'm asking you, send me somewhere to get some help, give me some time now, whatever needs to be done . . . . I need to get out of there ASAP. Forget about fighting my case, forget about representing myself, just give me time now, release me, whatever needs to be done, . . . it's going to get worser. I need to get out of there."

After the judge explained to him that he couldn't get his case resolved until he went to trial or pled guilty, appellant stated the police had failed to conduct a "51/50 evaluation" on him when they picked him up at the border. (See Welf. & Inst. Code, § 5150.) When the court asked him if he wanted one now, appellant didn't answer the question at first. Rather, he just said the jail staff was giving him the wrong medications and failing to meet his mental health needs. But when the court asked him if he needed to be examined by a psychotherapist, appellant said yes. He claimed he hadn't been able to make that request in writing because they wouldn't let him go to the law library.

Skeptical that appellant's alleged problems stemmed from any mental issues, the judge told appellant "you seem to be very capable and knowledgeable about what's going on around you, you're just not happy about it." When the court reminded appellant he had already had a trial on his mental competency, he said the doctors and officers who testified against him had lied. The court told appellant it would not hesitate to order an evaluation if it had a doubt about his competency. However, the court said it hadn't arrived at a decision about that. The judge told appellant, "I have some concerns as to what you're doing, right now, but . . . you seem to know exactly what you're doing." Asked if that was correct, appellant said, "Well, sir, it's called patience." He

12

then alleged that the guards in jail were trying to bait him into reacting so they could get another charge against him.

At that point, the court declared a doubt about appellant's ability to go forward in the case. But the court made it clear it was not concerned about appellant's competency to stand trial but rather his ability to represent himself. While observing that appellant "seems to be oriented as to time and place" and "seems to know what's going on," the court continued the matter for 30 days so a doctor could examine appellant and determine whether he had the mental capacity to represent himself at trial.

When court reconvened a month later, on August 24, 2012, the judge summarized the lengthy history of appellant's case and announced it had reviewed appellant's voluminous jail records. The judge stated, "Those records are replete with [appellant's] disruptive behaviors including . . . continuous disrespect and abuse" of jail staff and personnel in the form of threats and violent behavior. Appellant's records also revealed he had intentionally refused to use the library and receive medical treatment on numerous occasions. The court felt appellant's jail records contradicted many of the representations he had made about being mistreated and being denied access to jail services. The court also noted that appellant had been placed on suicide watch several times and that after refusing to leave his cell for a court hearing one day, he spent several hours talking to a hand puppet he had fashioned from one of his socks.

Speaking to appellant directly, the court then made the following findings: "Number one, I believe you have engaged . . . continuously and consistently in disruptive, disrespectful behavior for over two years both in and outside of this courtroom. [¶] Two, you've consistently exhibited disorganized thinking. [¶] Three, you seem to have numerous deficits in sustaining attention and concentration. [¶] Four, I believe you have exhibited impaired expressive abilities, anger, and anxiety issues, all of which are common symptoms of severe mental illnesses, which the [c]ourt feels can and will impair your ability to play the significantly expanded role required for self-

13

representation even if you could play the lesser role of a represented defendant. [¶] You have been accomplishing nothing representing yourself and could, in the [c]ourt's opinion, be deprived of a fair trial if allowed to continue your self-representation." Thereupon, the court revoked appellant's in propria persona status and appointed the public defender to represent him.

At the next court hearing, on August 31, 2012, the court clarified that in revoking appellant's pro per status, it did not mean to imply appellant was incompetent to stand trial. To the contrary, the court said it saw "no problem" in terms of appellant being able to assist his attorney in representing him. After hearing that, appellant asked the court for a new lawyer on the basis his attorney had "mentally assaulted" him. However, before the court could conduct a hearing on that request, appellant announced he wasn't feeling well and walked out of the courtroom, so the hearing was put over until September 6, 2012.

That day, appellant accused both his attorney and the judge of not listening to him and being biased against him. He also alleged an officer had assaulted him in the courtroom and no one was helping him. Defense counsel told the court that appellant was angry and frustrated over his situation. In fact, counsel had been forced to terminate their latest meeting because appellant got so worked up. The court attributed the friction between appellant and his attorney to appellant's failure to get along with other people. It did not believe there was sufficient justification to grant appellant a new attorney.

At a trial readiness hearing on September 21, 2012, appellant was removed from the courtroom for trying to spit on his attorney. It was also revealed that he might have threatened his attorney at one point. Because of this, the court appointed appellant a new attorney off of the conflict panel. By the time the case finally made it to trial in October 2012, appellant had two open cases for possessing weapons in jail and three pending charges involving his alleged use of threats and violence against jail personnel. However, during his trial, appellant was shackled and did not act out.

14

The law is clear: "A person cannot be tried or adjudged to punishment while mentally incompetent. [Citation.] A defendant is mentally incompetent if, as a result of a mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 131.) However, all criminal defendants are presumed to be competent. (*Ibid*.) The burden rests on the defense to prove by a preponderance of the evidence that the defendant is mentally unfit to stand trial. (*Ibid*.)

Moreover, "[w]hen, as here, a competency hearing has already been held and the defendant was found to be competent to stand trial, a trial court is not required to conduct a second competency hearing unless 'it "is presented with a substantial change of circumstances or with new evidence"' that gives rise to a 'serious doubt' about the validity of the competency finding. [Citation.] More is required than just bizarre actions or statements by the defendant to raise a doubt of competency. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 33.) "Reviewing courts give great deference to a trial court's decision whether to hold a competency hearing. '"'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.'"' [Citations.]" (*People v. Marks* (2003) 31 Cal.4th 197, 220.)

Appellant argues the trial court's remarks when it revoked his in propria persona status on August 24, 2014 "make it manifestly clear" the court had doubts about his competency, and therefore the court should have suspended criminal proceedings and held a competency hearing. However, in finding appellant had exhibited some signs of mental impairment, the court drew a distinction between his ability to represent himself and his competency to stand trial. Indeed, the California Supreme Court, following the invitation of *Indiana v. Edwards* (2008) 554 U.S. 164, has applied "a higher standard of mental competence for self-representation than for competency to stand trial." (*People v.*

15

*Johnson* (2012) 53 Cal.4th 519, 523.) Even though a defendant may be competent to stand trial, he may be denied the right to represent himself if, as appellant demonstrated here, his mental limitations preclude him from carrying out the duties required to present a defense without the assistance of an attorney. (*Id.* at pp. 527-532.) In other words, a finding the defendant is incompetent to proceed to trial without an attorney does not mean he is incompetent to stand trial with an attorney. (See *Indiana v. Edwards, supra*, 554 U.S. at p. 174 [referring to defendants who are competent enough to stand trial but not represent themselves as "gray-area defendants"].)

Having carefully reviewed the voluminous record in this case, we believe the trial was not only remarkably patient and exceedingly fair in terms of listening to and handling appellant's numerous motions, requests and complaints, but also uniquely situated to assess whether the circumstances warranted a second competency hearing. It's particularly telling in our view that although the court found appellant's mental skills were somewhat diminished, it attributed appellant's antics to his "lack of appreciation and respect . . . for the rules, procedures, and policies of the court."

The record supports the implied finding of both the competency jury and the trial court that appellant was – if not manufacturing – at the very least exaggerating his mental problems. The psychologists charged with evaluating appellant pegged him as a malingerer, and there was plenty of evidence to support that assessment. In fact, during the vast majority of appellant's court appearances, he reflected a solid understanding of the criminal process and demonstrated the ability to assist his attorney *if he chose to do so*, which shows he was competent to stand trial. The fact appellant didn't get along with jail personnel, acted out in court sometimes, and did everything in his power to get rid of his attorney does not compel a contrary conclusion.

At bottom, we do not believe the circumstances were such so as to warrant another round of competency proceedings. Therefore, the trial court did not err in failing to declare a doubt about appellant's competency to stand trial and failing to conduct a

second hearing on that issue. No cause for reversal has been shown. (See *People v. Halvorsen* (2007) 42 Cal.4th 379 [competency hearing not required even though defendant was bipolar and his statements were filled with strange and irrelevant comments]; *People v. Welch* (1999) 20 Cal.4th 701 [competency hearing not required even though the defendant was extremely paranoid and repeatedly disrupted courtroom proceedings].)

*Lack of Instructions on Heat of Passion Manslaughter*

Appellant contends the trial court prejudicially erred in failing to instruct the jury on the heat of passion theory of voluntary manslaughter. We disagree.

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support. . . . [¶] . . . [T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Rather, the defendant must show there is substantial evidence he committed only the lesser, and not the greater, offense. (*People v. Hughes* (2002) 27 Cal.4th 287, 367.)

In this case, the trial court instructed the jurors that if they believed appellant committed murder but was provoked, they could consider that in deciding whether he was guilty of first or second degree murder.[1] However, the court refused appellant's request to instruct on voluntary manslaughter, which is a lesser included offense of murder. Although defense counsel argued Garcia's decision to leave appellant was adequate provocation to justify instructions on heat of passion manslaughter, the court did not believe the evidence rose to the level to justify instructions on that offense.

---

[1]  Specifically, per CALCRIM No. 522, the court instructed, "Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

17

The trial court's ruling was correct. Heat of passion manslaughter "'has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively . . . . "[It] must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances" . . . . [Citation.]' [Citations.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) "The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 60.)

Romantic breakups are always emotionally painful, particularly for the person getting let go. But they almost never cause ordinarily reasonable people to lose reason and judgment. And in this case, appellant knew for weeks before the murder that Garcia wanted to end their relationship. Expecting his might happen, appellant told a coworker he would kill Garcia if she ever tried to leave him. This circumstance undermines appellant's claim that his decision to kill Garcia was rash and impulsive. Since he knew well in advance of the murder that Garcia wanted to move on without him, appellant was not entitled to instructions on heat of passion manslaughter. Irrespective of his subjective state of mind, the objective circumstances surrounding the murder were simply not such as to lead the average person to lose all reason and judgment and act in an impetuous, uncontrollable manner. (See *People v. Hach* (2009) 176 Cal.App.4th 1450, 1458-1459 [even though the defendant shot and killed a man he caught fooling around with his common law wife, the heat of passion theory of voluntary manslaughter did not apply because the wife had previously informed the defendant that she wanted to leave him].)

As noted above, the court did instruct the jurors that if they believed appellant committed murder but was provoked, they could consider that in determining whether he was guilty of first or second degree murder. Equating the provocation

required to reduce murder one to murder two with the provocation required to reduce murder to manslaughter, appellant argues, "The very fact that the trial court found sufficient provocation to instruct on second degree murder means that the trial court erred in finding that there was not sufficient provocation to require instruction on voluntary manslaughter." Not so.

"To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. [Citation.] If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. [Citation.] If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter. [Citation.]" (*People v Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

Here, there may have been sufficient evidence to support a finding appellant was subjectively blinded by passion when he killed Garcia. But the objective circumstances were not such so as to cause the average, sober person to react with deadly passion. Therefore, while there was nothing wrong with allowing the jury to consider whether appellant was provoked in deciding on the degree of murder, there was no need to instruct on voluntary manslaughter. In fact, the jury's finding that appellant committed first degree premeditated murder shows that it rejected appellant's claim he was provoked. Therefore, even if the court erred in failing to instruct on voluntary manslaughter, the error was harmless. (*People v. Elliot* (2005) 37 Cal.4th 453, 475 [any error in failing to instruct on lesser included offense was harmless because the factual question posed by that instruction was resolved against appellant under other properly given instructions].)

19

*Adequacy of Murder Instructions*

Lastly, appellant claims the trial court failed to define second degree murder and effectively left the jury with an "all-or-nothing" choice between first degree murder and acquittal. The claim is not well taken.

On review, jury instructions "'should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.) We "'"assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"'" (*Id*. at p. 1111.) In determining whether instructional error has occurred, we must consider the record as a whole. (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) Unless there is a reasonable likelihood the jury misunderstood the challenged instruction in a manner that violated defendant's rights, we must uphold the court's charge to the jury. (*Ibid*.)

After instructing on the elements of murder, the court told the jurors, "If you decide that a defendant committed murder, you must then decide whether it is murder of the first or second degree." (CALCRIM No. 520.) The court then explained the elements of first degree premeditated murder and instructed, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder." (CALCRIM No. 521.) Next, the court instructed provocation may reduce a murder from first degree to second degree. Then, it informed the jurors if they agreed defendant was not guilty of first degree murder but was guilty of second degree murder, they should find him guilty of second degree murder.

Appellant argues the court not only erred in failing to explain the difference between first and second degree murder, it should have expressly informed the jury all

20

murders that are not in the first degree are instead second degree.[2]  But the court did distinguish between first and second degree murder by instructing on the concepts of premeditation and provocation.  Under the court's instructions, the only way the jurors could find appellant guilty of first degree murder was if they found he acted with premeditation.  The obvious implication of this was that if appellant committed murder without premeditation, he was only guilty of murder in the second degree.  The court also told the jury that if appellant was provoked to commit murder, the crime was murder two.  Thus, the two degrees of murder were adequately defined and explained.

While it would not have hurt to expressly inform the jury that all murders that are not committed in the first degree are second degree murders, the court's instructions, viewed in their totality, made this point clear.  It is not reasonably likely the jury failed to grasp the distinction between murder one and murder two or that it felt it had an all-or-nothing choice between first degree murder and acquittal.  The court's instructions were appropriate.

DISPOSITION

The judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

---

[2]  While the current version of CALCRIM No. 521 contains this information, the 2011 edition, which the trial court used at the time in trial, did not.

21